CUAUHTEMOC ORTEGA (Bar No. 257443)
Federal Public Defender
DANIEL NATAL (Bar No. 346662)
(E Mail: daniel_natal@fd.org)
Deputy Federal Public Defender
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-5063
Facsimile: (213) 894-0081

Attorneys for Defendant
DANIEL EMILIANO ESCOBAR

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:22-cr-00359-AB |
| Plaintiff, | |
| v. | **DANIEL EMILIANO ESCOBAR'S REPLY IN SUPPORT OF HIS MOTION TO DISMISS THE INDICTMENT** |
| DANIEL EMILIANO ESCOBAR, | |
| Defendant. | Hearing Date: September 15, 2023 |
| | Hearing Time: 1:30 P.M. |

Defendant Daniel Emiliano Escobar, through his attorney of record, Deputy Federal Public Defender Daniel Natal, hereby files this reply to the government's opposition ("Opposition," Dkt. No. 41), and in support of Mr. Escobar's motion to dismiss the Indictment as unconstitutional as applied to Mr. Escobar ("Motion," Dkt. No. 39).

//
//
//
//
//
//

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

CUAUHTÉMOC ORTEGA
Federal Public Defender

DATED:  September 8, 2023      By  */s/ Daniel Natal*
_____
DANIEL NATAL
Deputy Federal Public Defender
Attorney for DANIEL EMILIANO ESCOBAR

# TABLE OF CONTENTS

Page

I. ARGUMENT…………………………………………………………………1

A. *Bruen*'s First Prong: Mr. Escobar's Conduct is Protected by the Plain Language of the Second Amendment ....................................................... 1

    1. Whether or not convicted felons are among "the people" is only relevant to *Bruen*'s second, not first, prong....................................... 1

    2. Non-violent felons like Mr. Escobar are among "the people" who have a right to bear arms............................................................. 2

B. *Bruen's* Second Prong: The Government Cannot Meet its Burden of Showing that there is a Relevantly-Similar Historical Analog to Non-Violent Felon Disarmament ................................................................. 8

    1. The scholarly articles cited by the Government do not support a history of non-violent felon disarmament. ........................................ 8

    2. The Massachusetts and Pennsylvania proposals on the right to bear arms at the Constitutional Convention are not persuasive evidence of non-violent felon disarmament. .................................. 10

    3. *Range* is not distinguishable from Mr. Escobar's case and *Jackson*'s reasoning is not persuasive. ........................................... 11

C. Mr. Escobar Does Not Seek to Collaterally Attack his Prior Convictions.................................................................................... 13

II. CONCLUSION ...................................................................................... 16

i

# TABLE OF AUTHORITIES

Page(s)

**Federal Cases**

*Burgett v. Texas*,
    389 U.S. 109 (1967)................................................................13, 14, 15

*District of Columbia v. Heller*,
    554 U.S. 570 (2008).......................................................................*passim*

*Gideon v. Wainwright*,
    372 U.S. 335 (1963).................................................................................13

*Griffin v. California*,
    380 U.S. 609 (1965).................................................................................14

*Kanter v. Barr*,
    919 F.3d 437 (7th Cir. 2019) ...............................................................3, 11

*McDonald v. City of Chicago*,
    561 U.S. 742 (2010).......................................................................*passim*

*Miller v. Gammie*,
    335 F.3d 889 (9th Cir. 2003) (en banc) ....................................................4

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
    142 S. Ct. 2111 (2022)....................................................................*passim*

*Range v. Att'y Gen. United States of Am.*,
    69 F.4th 96 (3d Cir. 2023) ...................................................3, 11, 12, 13

*Teter v. Lopez*,
    2023 WL 5008203 (9th Cir. Aug. 7, 2023).............................................4

*United States v. Bullock*,
    2023 WL 4232309 (S.D. Miss. June 28, 2023)......................................2

*United States v. Burt*,
    802 F.2d 330 (9th Cir. 1986) ..........................................................14, 15

*United States v. Hicks*,
    2023 WL 164170 (W.D. Tex. Jan. 9, 2023)...........................................6

*United States v. Jackson*,
    69 F. 4th 495 (8th Cir. 2023) ................................................................12

# TABLE OF AUTHORITIES

Page(s)

*United States v. Quiroz*,
    629 F. Supp. 3d 511 (W.D. Tex. 2022) ...................................................................2

*United States v. Scroggins*,
    599 F.3d 433 (5th Cir. 2010) ...........................................................................3

*United States v. Skoien*,
    614 F.3d 638 (7th Cir. 2010) .........................................................................11

*United States v. Vongxay*,
    594 F.3d 1111 (9th Cir. 2010) ...............................................................4, 5, 6

*Voisine v. United States*,
    579 U.S. 686 (2016).......................................................................................3

**Federal Statutes**

18 U.S.C. § 922(g)(1) ....................................................................................*passim*

18 U.S.C. § 922(h)(1) ...........................................................................................14

**State Statutes**

Cal. Health and Safety Code § 11370.1(a) ...........................................................12

Cal. Penal Code § 25850(a) ...................................................................................12

**Other Authorities**

Bernard Schwartz*, The Bill of Rights: A Documentary History 662 (1971)* ............10, 11

Carlton F.W. Larson, *Four Exceptions in Search of A Theory: District of
    Columbia v. Heller and Judicial Ipse Dixit*, 60 HASTINGS L.J. 1371,
    1374 (2009)...................................................................................................5

Don B. Kates, Jr., *The Second Amendment: A Dialogue*, 49 LAW &
    CONTEMP. PROBS. 143, 146 (1986).................................................................5

Glenn Harlan Reynolds, *A Critical Guide to the Second Amendment*, 62
    TENN. L. REV. 461, 480 (1995)......................................................................5

Joseph G.S. Greenlee, *The Historical Justification for Prohibiting
    Dangerous Persons from Possessing Firearms*, 20 WYO. L. REV. 249,
    277 (2020)...............................................................................................5, 6, 9

# TABLE OF AUTHORITIES

Page(s)

Ryan S. Killian, *Dicta and the Rule of Law*, 2013 Pepp. L. Rev. 1, 8, 10
(2013)..................................................................................................................3

Saul Cornell & Nathan DeDino, *A Well Regulated Right: the Early
American Origins of Gun Control*, 73 Fordham L. Rev. 487, 501
(2004)..................................................................................................................9

Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which
Rest Upon the Legislative Power of the States of the American Union*
(1st ed. 1868) .....................................................................................................8

# I. ARGUMENT

Relying on a patchwork of dicta, pre-*Bruen* decisions, and a two-Justice concurring opinion in *Bruen*, the Government insists that Mr. Escobar's conduct is not protected by the Second Amendment.  But despite the Government's argument to the contrary, both founding-era history and the directives of *Heller*[1] and *Bruen*[2] compel the conclusion that non-violent felons *are* among "the people" described by the Second Amendment.  Moreover, the Government's historical analysis falls well-short of meeting its burden of establishing a historical analog to section 922(g)(1).  For those reasons, and the other reasons described below, the Court should reject the Government's arguments, grant Mr. Escobar's Motion, and dismiss the Indictment.

## A.    *Bruen*'s First Prong: Mr. Escobar's Conduct is Protected by the Plain Language of the Second Amendment

### 1.    Whether or not convicted felons are among "the people" is only relevant to *Bruen*'s second, not first, prong.

The Government begins its Opposition by arguing that "[t]he plain text of the Second Amendment does not include felons, dangerous or otherwise," and that Mr. Escobar is therefore not presumptively protected by the Second Amendment. (Opposition at 13.)  But as the Defense outlined in its Motion, *Bruen*'s first prong commands courts to examine only whether the Second Amendment "covers an individual's *conduct*," not their status.  (Motion at 15 (quoting *Bruen*, 142 S. Ct. at 2129–30 (emphasis added).)  The first prong's emphasis on an analysis of an individual's conduct (rather than the individual's status) is buttressed by *Heller*, which emphasized the broad meaning of the term "the people" in the Second Amendment. *Heller*, 554 U.S. at 580.  This term, the *Heller* majority stressed, "refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community."  *Id.*

---

[1] *District of Columbia v. Heller*, 554 U.S. 570 (2008).
[2] *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022).

1

For that reason, *Heller* wrote, "we start [] with a strong presumption that the Second Amendment right is exercised individually *and belongs to all Americans*." *Id.* at 581 (emphasis added). In line with this reasoning, several courts have held that felons *are* included among "the people," and whether their possession of a firearm within the home can be regulated is a matter that can only be addressed in the second *Bruen* prong—a prong that places the burden on the Government to establish a historical analog justifying the curtailing of an individual's Second Amendment rights. *See United States v. Bullock*, No. 3:18-CR-165-CWR-FKB, 2023 WL 4232309, at *20 (S.D. Miss. June 28, 2023) (holding as much); *United States v. Quiroz*, 629 F. Supp. 3d 511, 516 (W.D. Tex. 2022) (holding the same).

Indeed, the Government does not appear to address the above argument or explain why *Bullock* and *Quiroz* were incorrectly reasoned. Instead, it assumes that Mr. Escobar's status as a felon necessarily pertains to the first *Bruen* prong, even as it conducts a largely historically-based analysis to support its arguments. But even setting aside which prong the analysis of Mr. Escobar's felon-status falls under, the Government's argument that felons are not included among "the people" referred to in the Second Amendment is fundamentally wrong on several levels.

## 2. Non-violent felons like Mr. Escobar are among "the people" who have a right to bear arms.

First, basic principles of legislative interpretation counsel that the plain language of legislation controls when it is unambiguous. As highlighted above, the plain text of the Second Amendment confers the right to bear arms on "the people"—a term that *Heller* defined as all members of the political community, not an unspecified subset." *Heller*, 554 U.S. at 580. Furthermore, to the extent there is any confusion about the meaning of "the people," other constitutional amendments provide guidance: the First and Fourth Amendments also confer rights to "the people," and have been universally interpreted to extend to convicted felons. The broad use of the term "the people" in the

2

1  Second Amendment—along with the usage of that term in other Amendments—simply
2  provides no reason to distinguish between felons and non-felons.

3       Perhaps knowing its argument has little basis in the text of the Second
4  Amendment, the Government relies heavily on a combination of dicta from *Heller*,
5  *McDonald*[3] and *Bruen* to justify limiting the Second Amendment to only "law-abiding"
6  citizens.  (Opposition at 13-14 (citing *Heller*, *McDonald*, and *Bruen*).)  But as several
7  circuit courts have already observed, "the criminal histories of the plaintiffs in *Heller*,
8  *McDonald*, and *Bruen* were not at issue in those cases.  So their references to 'law-
9  abiding, responsible citizens' were dicta." *Range v. Att'y Gen. United States of Am.*, 69
10  F.4th 96, 101 (3d Cir. 2023); *see also United States v. Scroggins*, 599 F.3d 433, 451
11  (5th Cir. 2010) (describing *Heller*'s off-handed remark approving of felon disarmament
12  as "[d]icta").  Even Justice Thomas, who joined the majority in *Heller* and *McDonald*
13  and who authored *Bruen*, has described the language cited by the Government in *Heller*
14  (and echoed by the *McDonald* majority and the concurrences in *Bruen*) as dicta.  *See*
15  *Voisine v. United States*, 579 U.S. 686, 715 (2016) (Thomas, J., dissenting).  As a
16  circuit judge, Justice Barrett agreed with Justice Thomas.  *Kanter v. Barr*, 919 F.3d
17  437, 453 (7th Cir. 2019) (Barrett, J., dissenting) ("The constitutionality of felon
18  dispossession was not before the Court in *Heller*, and because it explicitly deferred
19  analysis of this issue, the scope of its assertion is unclear.").

20       In a footnote, the Government also contends that Justice Kavanaugh's
21  concurrence—which explicitly approves of the limitations on felons' Second
22  Amendment rights expressed in *Heller* and *McDonald*—binds this Court as the most
23  narrow opinion of a fractured Supreme Court.  (Opposition at 13 n.1.)  But like in
24  *Heller* and *McDonald*, the criminal history of the petitioners in *Bruen* was completely
25  irrelevant to the legal issue at hand.  Statements of the Supreme Court that do not
26  address a matter at issue in a case are not binding.  *See* Ryan S. Killian, *Dicta and the*

27
28

---

[3] *McDonald v. City of Chicago*, 561 U.S. 742 (2010).

3

1    *Rule of Law*, 2013 Pepp. L. Rev. 1, 8, 10 (2013) ("[D]icta is regarded as any portion of

2    the opinion that is inessential to the outcome… dicta [] does not have the force of

3    law… and is thus rightly not relied on as law.")  And although Justice Kavanaugh's

4    reference to "longstanding prohibitions on the possession of firearms by felons" was

5    dicta, the remainder of his opinion expresses support for the mode of historical analysis

6    espoused by the rest of the *Bruen* plurality—meaning a majority of Justices supported

7    the two-step historical analysis in *Bruen*.  *Bruen*, 142 S. Ct. at 2161 (Kavanaugh, J.,

8    concurring).  The Government fails to explain how to reconcile the historically-based

9    analysis compelled by a majority of the Justices with the dicta it states is controlling.

10   The simplest solution is the one the Court should apply in this case: section 922(g)(1)

11   should be subjected to the same analysis as the New York licensing scheme at issue in

12   *Bruen*.

13        Second, the Government contends that the Ninth Circuit's holding in *United*

14   *States v. Vongxay*, 594 F.3d 1111 (9th Cir. 2010) compels the conclusion that "felons

15   fall entirely outside the 'class' protected by the Second Amendment."  (Opposition at

16   15.)  Not so.  In fact, as the Government acknowledges, *Vongxay* explicitly admitted

17   that the "historical question" underpinning the constitutional permissibility of felon

18   disarmament was "not definitively resolved." *Vongxay*, 594 F.3d at 1118.  And under

19   *Bruen*, which was published twelve years after the Ninth Circuit's decision in *Vongxay*,

20   "ambiguous history" is "not sufficiently probative" to uphold a gun regulation.  *Bruen*,

21   142 S. Ct. at 2139.  Tellingly, in one of its first published decisions on the scope of

22   Second Amendment rights following *Bruen*, the Ninth Circuit explicitly declined to

23   decide "whether criminals are included among 'the people' referenced [in] the Second

24   Amendment's text." *Teter v. Lopez*, No. 20-15948, 2023 WL 5008203, at *9 n.9 (9th

25   Cir. Aug. 7, 2023).  This footnote would be curious if one accepts, as the Government

26   urges, that *Vongxay* already forecloses that issue.

27        Furthermore, it is impossible to reconcile the character of *Vongxay*'s historical

28   analysis with the historical analysis required by *Bruen*.  *See Miller v. Gammie*, 335 F.3d

4

889, 890, 893 (9th Cir. 2003) (en banc) (holding that prior circuit precedent is no longer binding when "the reasoning… of our prior circuit authority is clearly irreconcilable with the reasoning… of intervening higher authority."). Specifically, *Vongxay* relied on two scholarly sources to opine that certain rights, like the right to bear arms, were only extended to "virtuous" citizens. *Vongxay*, 594 F.3d at 1118. Both scholarly sources inferred this "virtue" limitation from historical evidence of founding-era commentators who espoused "classical republican political philosophy"—as opposed to inferring it from a history of enacted firearm regulations in 1791. *See* Don B. Kates, Jr., *The Second Amendment: A Dialogue*, 49 LAW & CONTEMP. PROBS. 143, 146 (1986); Glenn Harlan Reynolds, *A Critical Guide to the Second Amendment*, 62 TENN. L. REV. 461, 480 (1995).

Both the Kates article and the Reynolds article have been subject to scholarly criticism for their failure to cite to historical regulations for support. One scholar has observed that the Reynolds' article is unhelpful to assessing whether an accepted tradition of felon disarmament existed in 1791 because the article "included no examples of laws disarming 'unvirtuous' citizens." Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Firearms*, 20 WYO. L. REV. 249, 277 (2020) (hereinafter "Greenlee, *Historical Justification*"). Similarly, other scholars have criticized Kates' article because "the actual sources Kates relied upon (and which subsequent writers have echoed) are surprisingly thin. Indeed, [it appears] no colonial or state law in eighteenth-century America formally restricted the ability of felons to own firearms." Carlton F.W. Larson, *Four Exceptions in Search of A Theory: District of Columbia v. Heller and Judicial Ipse Dixit*, 60 HASTINGS L.J. 1371, 1374 (2009); *see also* Greenlee, *Historical Justification*, 20 WYO. L. REV. at 275-76 (critiquing Kates' two articles supporting felon disarmament because they both "provide[ ] no meaningful support for the theory" and lack "any examples of laws disarming 'unvirtuous' citizens").

The lack of any historical regulations providing for the disarmament of unvirtuous citizens is significant because *Bruen* repeatedly stressed that only historical evidence of enacted "regulations" can justify the curtailment of Second Amendment rights. *See Bruen*, 142 S. Ct. at 2126 (stating that courts should look to the "historical tradition of firearm regulation" to determine the scope of Second Amendment rights); *see also id.* at 2130, 2131–32, 2135. *Bruen* demonstrated this requirement by conducting its historical examination of New York's licensing regime by searching only for enacted historical "regulations," *i.e.*, positive law, laid out in statutes or judicial decisions. *Id.* at 2138–56. Put simply, evidence of the founding-era philosophy cited in *Vongxay* is not only unpersuasive, but fails to satisfy the historical analysis called for in *Bruen*.[4]

*Third*, as a matter of legislative interpretation, reading "the people" in the Second Amendment to mean only "law-abiding, responsible" people would create an unmanageable legal standard that leads to absurd results. What is a "law-abiding, responsible" person? Even the most honorable person is guilty of doing unlawful, irresponsible things. If the Second Amendment applies only to the "law-abiding [and] responsible," does the habitual jaywalker forfeit their right to a firearm? The reckless speeder? The compulsive shoplifter? Would the Government be permitted to disarm a driver who routinely fails to use their turn signal? What about the car passenger who never buckles their seatbelt? *See United States v. Hicks*, No. W:21-CR-00060-ADA, 2023 WL 164170, at *4 (W.D. Tex. Jan. 9, 2023) ("[D]efining 'the people' as law-abiding, responsible citizens would lead to absurd results. The Government surely doesn't believe that someone ticketed for speeding—thus, not abiding by the law— should lose their Second Amendment rights. Nor should the person who negligently (irresponsibly) forgets to set out the 'Wet Floor' sign after mopping lose their Second

---

[4] The Government reiterates under the Opposition's analysis of the second *Bruen* prong that *Vongxay* "upheld section 922(g)(1) based on a historical analysis of the Second Amendment" and binds this Court. (Opposition at 19.) That argument is erroneous for the same reasons articulated above.

Amendment rights.  Of course not.").  Who, does the Government suggest, are "law-abiding, responsible" people?  It offers no guidance in its Opposition, other than "not Mr. Escobar."

For all of the line-drawing problems created by the Government's "law-abiding [and] responsible" standard, another issue posed by the standard is equally problematic: because the Government can (and frequently does) expand the criminal code, a "law-abiding, responsible" citizen standard effectively gives the Government free reign to narrow the Second Amendment as it pleases.  If the Government elects to make an increasing number of acts illegal—as it has done innumerable times over the last century—it can deprive more and more people of the right to possess a firearm by accusing them of failing to be "responsible" or "law-abiding."  In effect, the "law-abiding [and] responsible" standard would impermissibly allow the Government to "exempt [large groups of people] from the Second Amendment and would eviscerate the general right to publicly carry arms for self-defense." *Bruen*, 142 S. Ct. at 2134; *see also id.* (pointing out that New York's over-broad definition of a "sensitive place" as including any major city would effectively permit the state to circumvent the Second Amendment at will).  For that reason, the Government's proposed standard fails to pass muster, and would engender absurd, arbitrary outcomes if adopted by the Court.

In sum, the Court should reject the Government's arguments that the plain language of the Second Amendment does not protect non-violent felons like Mr. Escobar.  Even if his status as a felon is relevant to the first *Bruen* prong, neither Ninth Circuit caselaw, nor Supreme Court dicta, nor regulatory history supports the proposition that the Second Amendment extends only to "virtuous" or "law-abiding, responsible" citizens.  Finally, the concept of "law-abiding [and] responsible" citizenry is unworkably vague and ambiguous, and would result in exceptions to the Second Amendment that swallow the right to possess a firearm.  Accordingly, this Court should find Mr. Escobar's conduct of possessing a firearm in his own home is protected by the plain text of the Second Amendment.

**B.** ***Bruen's* Second Prong: The Government Cannot Meet its Burden of Showing that there is a Relevantly-Similar Historical Analog to Non-Violent Felon Disarmament**

Because Mr. Escobar's conduct is covered by the plain text of the Second Amendment, the Government bears the burden of proving that the infringement of his firearm rights are justified by a history of analogous firearm regulations.  But the Government's attempts in the Opposition to cite to a historical analog of felon disarmament fall well-short of its burden.  Below, Mr. Escobar addresses each of the Government's arguments in turn.

**1.  The scholarly articles cited by the Government do not support a history of non-violent felon disarmament.**

The Government begins its historical analysis by quoting Tomas M. Cooley's 1868 treatise, which it cites for the proposition that "some classes of people were 'almost universally excluded' from exercising certain civic rights, including 'the idiot, the lunatic, and *the felon*, on obvious grounds.'" (Opposition at 16 (quoting Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union*, 29 (1st ed. 1868)) (hereinafter "Cooley, *A Treatise*") (emphasis added in Opposition).)  But the excerpt quoted by the Government comes from Cooley's discussion of *voting rights*, not gun rights.  *See* Cooley, *A Treatise*, at 29 ("Certain classes have been almost universally excluded,—the slave, the woman, the idiot, the lunatic, and the felon... The theory in these cases we take to be that classes are excluded because they lack either the intelligence, the virtue, or the liberty of action essential *to the proper exercise of the elective franchise*.") (emphasis added).  With regard to the scope of gun rights, Cooley expressed no opinion, stating that "[a]mong the other defen[s]es to personal liberty should be mentioned the right of the people to keep and bear arms...  How far it is in the power of the legislature to regulate this right, we shall not undertake to say, as happily there has been very little occasion to discuss that subject by the courts." *Id.* at 350.  Thus, the quoted portion of

8

Cooley's treatise is historical evidence of the permissibility of felon

disenfranchisement, not disarmament.

Following its citation to Cooley's treatise, the Government cites again to the

Kates and Reynolds articles on the Second Amendment as evidence that felons were

not "virtuous" citizens and thus not historically entitled to bear arms.  (Opposition at

16.)  But as discussed above, neither the Kates nor Reynolds articles cite to evidence of

any founding-era regulations that permitted the permanent disarmament of felons or

unvirtuous citizens.  *See* Greenlee, *Historical Justification*, 20 WYO. L. REV. at 275-77.

The Saul Cornell articles cited by the Government in the Opposition similarly omit

reference to any historical regulation permitting the permanent, life-long disarmament

of felons or citizens who lacked virtue.[5]  Moreover, to varying degrees, all three articles

premise their views of the permissibility of felon disarmament on the idea that gun

---

[5] One Cornell article quoted by the Government does cite to a constable's guidebook from late eighteenth century New York for the proposition that "justices of the peace, sheriffs, and constables were empowered to disarm individuals who ride about armed in terror of the peace." (Opposition at 17 (citing Saul Cornell & Nathan DeDino, *A Well Regulated Right: the Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 501 (2004).) Cornell appears to have based this on a passage within the guidebook counseling that law enforcement who "f[ou]nd any person in arms, contrary to the form  of  the statute, [] [could] seize the arms, and commit  the offender to prison." The Conductor Generalis: Or the Office, Duty and Authority of Justices of the Peace, High-Sheriffs, Under-Sheriffs, Coroners, Constables, Gaolers, Jury-men, and Overseers of the Poor, at 12 (New York, Hugh Gaine 1788).

But even assuming for the sake of argument that the guidebook qualifies as a historical regulation under *Bruen*, this isolated historical source is heavily distinguishable from section 922(g)(1).  Specifically, the guidebook permitted only the seizure of a weapon specifically used to terrify or disturb the public, and did not prohibit those disarmed from possessing other arms in the future.  *Id.*  The guidebook also counseled that its scope was narrow, advising "that no wearing of arms is within the meaning of this statute unless it be accompanied with such circumstances as are apt to terrify the  people" and that "persons… are in no danger of offending against this statute by wearing common weapons or… upon such occasions, in which it is the common fashion to make use of them without causing the least suspicion of an intention to commit any act of violence or disturbance of the peace."  *Id.* at 11.  In other words, the guidebook did not prohibit anyone from possessing arms; it merely prohibited the *use* of arms to inflict harm on the public or incite terror.  This is an extremely far cry from the effect of section 922(g)(1) in this case, which permanently prohibits Mr. Escobar from possessing a firearm, not because he was inciting public terror or inflicting violence on others, but because he previously possessed a firearm years ago.

rights are best characterized as collective rights or civic rights (like voting or serving on a jury), rather than individual rights (like exercising free speech or assembly).  So too does the Government appear to espouse this idea.  (Opposition at 18 (stating that "the right to bear arms is analogous to other civic rights that have historically been subject to forfeiture by individuals convicted of crimes" and comparing the right to bear arms to the right to vote and serve on a jury).)  But this view of the Second Amendment as a civic right was flatly rejected in *Heller*, which clarified that possessing firearms is an individual right.  *Heller*, 554 U.S. at 595 (holding that "the Second Amendment confer[s] *an individual right* to keep and bear arms," and emphasizing that the Second Amendment is rooted in the individual's right to self-defense, rather than the collective right to serve in a militia) (emphasis added).  The Supreme Court again clarified the nature of the right to bear arms in *Bruen*: "individual self-defense is 'the central component' of the Second Amendment right."  *Bruen*, 142 S. Ct. at 2133 (quoting *McDonald*, 561 U.S. at 767).  Put plainly, the historical conclusions reached in each of the articles cited by the Government relies on a pre-*Heller* view of the Second Amendment that has since been rejected by the Supreme Court.

> **2.** **The Massachusetts and Pennsylvania proposals on the right to bear arms at the Constitutional Convention are not persuasive evidence of non-violent felon disarmament.**

Next, the Government cites the proposals of the Pennsylvania Anti-Federalists and the Massachusetts ratifying convention as support for the idea that felons were excluded from the right to bear arms.  (Opposition at 17–18 (citing 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 662 (1971).)  Mr. Escobar anticipated as much in his Motion, addressing each proposal and explaining why the proposals did not serve as historical evidence of non-violent felon disarmament.[6]  (Motion at 20–21.)

---

[6] Oddly, the Government cites the Massachusetts proposal as support for the concept of non-violent felon disarmament.  (Opposition at 18 ("Samuel Adams offered an amendment at the Massachusetts convention… recommending 'that the said

And while an at-length reiteration of that analysis is likely unnecessary, it bears repeating that both amendments proposed were rejected after failing to gather majority support in even their own delegations. *Kanter*, 919 F.3d at 454–55 (Barrett, J., dissenting) (reviewing historical records and observing that neither Pennsylvania's or Massachusetts' proposals even carried a majority of their convention). Moreover, as then-Judge Barrett pointed out in her *Kanter* dissent, no state—including Pennsylvania and Massachusetts—included similar limiting language on the right to bear arms enumerated in their state constitutions. *Kanter*, 919 F.3d at 455 (Barrett, J., dissenting); *see also United States v. Skoien*, 614 F.3d 638, 648 (7th Cir. 2010) (Sykes, J., dissenting) ("The court also asserts that '[m]any of the states, whose own constitutions entitled their citizens to be armed, did not extend this right to persons convicted of crime.' This is a considerable overstatement. Only four state constitutions had what might be considered Second Amendment analogs in 1791—Massachusetts, North Carolina, Pennsylvania, and Vermont—and none of these provisions excluded persons convicted of a crime.") Therefore, the Government's historical analysis falls well-short of demonstrating a "tradition of broadly prohibiting" Mr. Escobar's conduct. *See Bruen*, 142 S. Ct. at 2138, 2156.

### 3. *Range* is not distinguishable from Mr. Escobar's case and *Jackson*'s reasoning is not persuasive.

Finally, the Government concludes its historical analysis by citing to a string of Courts of Appeals decisions to support the idea that non-violent felon disarmament is

---

Constitution be never construed to authorize Congress… to prevent the people of the United States, who are peaceable citizens, from keeping their own arms.'") (quoting Schwartz, *The Bill of Rights: A Documentary History* at 674-75, 681).) The Government likely does so because it assumes the phrase "peaceable citizens" did not include citizens convicted of crimes. But the Government cites no basis for this assumption. Instead, the reference to "peaceable citizens" was more than likely a reflection of the practice of disarming those engaged in active violence, treason, or war against the new United States. (*See* Motion at 18-21 (discussing the history of such disarmament laws in colonial America).) In any event, it seems more significant as a matter of constitutional interpretation that the states rejected Massachusetts' proposal to confer the right to bear arms to "the people…. who are peaceable citizens," and instead adopted a Second Amendment conferring those rights to simply "the people."

11

constitutionally permissible.  (Opposition at 19.)  But all but one of those cases, *United States v. Jackson*, 69 F. 4th 495 (8th Cir. 2023), pre-dates *Bruen*.  (*Id.*)  As to *Jackson*, even the majority there conceded that "interpretation of the history [of felon disarmament] may be debatable."  *United States v. Jackson*, 69 F.4th 495, 502 (8th Cir. 2023).  And to arrive at its ultimate conclusion, the majority in *Jackson* was forced to analogize non-violent felon disarmament to the historical disarmament of Catholics, Native Americans, and British loyalists—a conclusion that, respectfully, does not logically follow.  *Id.* at 504.  A historical tradition of temporarily disarming one group of people based on their perceived dangerous cannot possibly mean the Government has carte blanche to permanently disarm all people of any status so long as it perceives them as dangerous.[7]  While *Bruen* does not require the Government to analogize to a "historical *twin*," *Bruen*, 142 S. Ct. at 2133, it must require more than the loose analogizing seen in *Jackson* for the Second Amendment to mean anything.

Finally, the Government's efforts to distinguish the Third Circuit's opinion in *Range* are minimal and unpersuasive.  (Opposition at 20 (citing *Range*, 69 F.4th at 110).)  To distance the case form Mr. Escobar, the Government merely points out that Mr. Escobar has sustained felony convictions, while the petitioner in *Range* was convicted of only a state misdemeanor.  (*Id.*)  But the Government's point is purely a semantical one: the "misdemeanor" conviction sustained by the petitioner in *Range* was punishable by up to five years in prison—a term of imprisonment normally reserved for felonies, and a greater term of imprisonment than either of Mr. Escobar's predicate felonies.  *Compare Range*, 69 F.4th at 98 (five year maximum punishment), *with* Cal. Health and Safety Code § 11370.1(a) (maximum punishment of four years) and Cal.

---

[7] Moreover, felons are fundamentally distinguishable from Catholics, Native Americans, and British loyalists because, unlike those three groups, they are only classified as felons because of actions taken by the Government to label them as such—as opposed to because of a personal religious belief, political belief, or ethnic identity. As pointed out above, this distinction could permit the Government to broadly exclude whoever it pleases from the right to bear arms by labeling them or their conduct as felonious.

1  Penal Code § 25850(a) (maximum punishment of three years).  Otherwise, the logic of

2  *Range* clearly applies to Mr. Escobar's case, and the Court should rely on its reasoning

3  to arrive at the same conclusion reached in that case.

4      In light of the lack of analogous historical regulations cited by the Government,

5  the Court should find that the Government has failed to meet its burden under *Bruen*'s

6  second prong, grant Mr. Escobar's Motion, and dismiss the Indictment with prejudice.

7  **C.  Mr. Escobar Does Not Seek to Collaterally Attack his Prior Convictions**

8      Lastly, contrary to the Government's assertion, Mr. Escobar is not moving to

9  collaterally attack his underlying state convictions in the Indictment.  Instead, Mr.

10  Escobar is arguing that 18 U.S.C. § 922(g)(1) as applied to Mr. Escobar is

11  unconstitutional because it creates a distinct and separate violation of his Second

12  Amendment rights by using a constitutionally infirm conviction to punish him anew.

13      A similar approach was seen in *Burgett v. Texas*, 389 U.S. 109 (1967).  There,

14  the defendant was being tried in Texas on a five count indictment.  *Id.* at 111.  The first

15  count charged him with assault, with the remaining counts consisting of allegations that

16  the petitioner-defendant had incurred four prior felony convictions that would increase

17  his sentence if he was convicted on count one.  *Id.*  During trial, defense counsel

18  objected to the introduction of copies of one of the conviction orders because the

19  judgment showed that the petitioner was not represented by counsel.  *Id.* at 112.  The

20  Court initially overruled the objection, but later ordered the jury not to consider the

21  prior offenses for any purpose.  *Id.*  The jury then convicted the petitioner on count one.

22  *Id.*  On appeal, the petitioner argued that the trial court erred in overruling his objection

23  to the admission into evidence of his prior conviction.  *Id.*

24      The Court of Criminal Appeals affirmed, but the Supreme Court reversed.  *Id.*

25  The Supreme Court pointed to its ruling in *Gideon v. Wainwright* that the Sixth and

26  Fourteenth Amendments made it unconstitutional to try a person for a felony in state

27  court unless they had a lawyer or had validly waived one.  *Id.* at 114.  It further

28  explained that the ruling in *Gideon* "was not limited to prospective applications.  In this

case the certified records of the [prior] conviction on their face raise a presumption that petitioner was denied his right to counsel in the [prior] proceeding, and therefore that his conviction was void." *Id.* at 114 (citations omitted). "To permit a conviction obtained in violation of *Gideon* [ ] to be used against a person," the Court continued, "is to erode the principle of that case. Worse yet, since the defect in the prior conviction was denial of the right to counsel, *the accused in effect suffers anew from the deprivation of that Sixth Amendment right.*" *Id.* at 115 (citations omitted) (emphasis added).

The Ninth Circuit's application of *Burget* to a violation of § 922(h)(1) in *United States v. Burt*, 802 F.2d 330 (9th Cir. 1986) is further instructive. In *Burt*, petitioner-defendant was charged with violating 18 U.S.C. § 922(h)(1), receipt of a firearm by a convicted felon. *Burt*, 802 F.2d at 331. The Government filed an application requesting that the defendant be sentenced as a dangerous special offender ("DSO") based on two prior convictions: a 1973 second-degree murder and a 1962 assault with a deadly weapon. *Id.* After the defendant was convicted, the trial court refused to include the 1962 conviction for purposes of qualifying the defendant as a DSO because the prosecutor and the 1962 trial judge commented on defendant's refusal to testify. *Id.* Although this was constitutionally permissible in 1962, the Supreme Court held in 1965 that such commentary violated a defendant's Fifth Amendment rights. *Id.* (citing *Griffin v. California*, 380 U.S. 609 (1965)). *Id.* The district court noted that *Griffin* was not retroactive but nevertheless found that the 1962 conviction was invalid to enhance the defendant's sentence, citing *Burget*. *Id.* at 332.

The Ninth Circuit affirmed. On appeal, the Ninth Circuit explained that "whether using [a prior conviction] conviction would erode the constitutional right involved, and whether the defendant is being punished again for the same constitutionally tainted conviction" guide a district court's determination as to the applicability of *Burget*. *Id.* The *Burt* court explained that *Burget* applied in cases "like Burt's, in which the conviction was obtained by constitutionally suspect means,

14

1   but because of the Supreme Court's retroactivity rules is not 'invalid' as a matter of

2   constitutional law."  *Id.*  The Ninth Circuit ultimately held that the district court

3   correctly applied *Burgett* to the 1962 conviction when it refused to consider it.  *Id.* at

4   335 ("To allow the government to enhance a subsequent sentence based on a conviction

5   involving [constitutional] error weakens the important constitutional right against self-

6   incrimination. . . . The district court [] correctly found that using the 1962 conviction

7   would be punishing Burt twice for the same constitutionally tainted conviction.")

8   (citations omitted).

9          Notably, the *Burt* Court reached its conclusion by rejecting several government

10  arguments that mirror those the Government advances against Mr. Escobar.  For

11  example, the Ninth Circuit rebuffed the Government's "contention that a conviction is

12  'invalid' for the purposes of the statute only if the conviction was or could have been

13  overturned on direct or collateral review."  *Id.*; (*see* Opposition at 23 ("[T]he Supreme

14  Court long ago held that the invalidity of a prior conviction is not a defense to being a

15  felon in possession… [a] felon must clear his status before obtaining a firearm")

16  (internal quotations omitted).)  As the Ninth Circuit explained, "[t]he government's

17  assertions misconstrue the Supreme Court's delicate balancing between retroactivity

18  and constitutional rights… nonretroactivity of a right does not imply that a conviction

19  obtained in violation of that right is valid for *all* purposes."  *Burt*, 802 F.2d at 336

20  (emphasis added).

21         Like the defendants in *Burgett* and *Burt*, Mr. Escobar's state court convictions

22  are on their face a violation of his right to bear arms.  Had Mr. Escobar's prior

23  convictions occurred after *Bruen*, there would be little doubt they were constitutionally

24  invalid.  Further prosecuting Mr. Escobar is a new, separate, and distinct violation of

25  his Second Amendment right.  The Court should refuse to punish Mr. Escobar twice for

26  the same constitutionally infirm convictions and dismiss this Indictment with prejudice.

27

28

1

## II. CONCLUSION

2      For all the foregoing reasons, the Court should grant Mr. Escobar's motion to

3  dismiss the Indictment with prejudice.

4                                  Respectfully submitted,

5                                  CUAUHTEMOC ORTEGA
Federal Public Defender

6

7

DATED:  September 8, 2023    By  */s/ Daniel Natal*

8                                  DANIEL NATAL

9                                  Deputy Federal Public Defender
Attorney for DANIEL EMILIANO ESCOBAR

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28